KICKBUSCH and others, Appellants, vs. CORWITH and others,
Respondents.

*September 8, 1900 — February 1, 1901.*

*Debtor and creditor: Fraudulent conveyances: Mortgage kept from rec-
ord by agreement: Voluntary assignment: Pleading: Laches: De-
lay in bringing suit: Sales by mortgagees in possession: Account-
ing: Lis pendens: Bona fide purchaser from fraudulent grantee.*

1. The parties to a mortgage of real estate agreed in writing that it
should not be recorded except in case of default in the payments
or the death of either party, the reason being that if recorded it
would injure the credit of the mortgagor in his business. The
agreement was observed for more than four years, during which
time various persons gave the mortgagor credit on the faith of his
apparent ownership of the property, with no knowledge of the
mortgage. *Held,* that the mortgage was fraudulent and void as
to the creditors so deceived.

2. A finding of the trial court to the effect that certain mortgages of
real estate and of chattels and a transfer of corporate stock, by an
insolvent debtor, were all made in good faith, to secure a *bona fide*
indebtedness, and with no intent to defraud or delay creditors,
is *held* to be sustained by the evidence.

3. An agreement between an insolvent debtor and two of his principal
creditors, and transfers made by and pursuant thereto, constituting
parts of the same transaction, whereby he transferred to them the
greater part of his property, real and personal, and they assumed
the management of his business, in order to prevent a sacrifice of
his property, and for the purpose of paying in a specified order
their claims and the judgments and liens of other creditors, with
provision for the reversion of any surplus to the debtor, are *held*
to have constituted a voluntary assignment for the benefit of cred-
itors, which, although not tainted with actual fraudulent intent,
was constructively fraudulent and void as to creditors because not
executed as the statute (sec. 1694, Stats. 1898) requires.

4. Such transfers may be set aside in an action by judgment creditors
of the insolvent, although their complaint does not specifically
charge that the transaction constituted an unlawful voluntary as-
signment, where it alleges generally that all the transfers were exe-
cuted as parts of one transaction, with the intent and purpose of
having all the property held in trust for the use and benefit of the
debtor contrary to law.

Kickbusch and others vs. Corwith and others.

5. Such agreement never having been recorded and not having come to the knowledge of the creditors attacking it until three or four years after its execution, up to which time there was nothing to inform them that the transferees were in possession in any other capacity than as mortgagees under prior valid and recorded mortgages, and reasonable diligence having been used thereafter in ascertaining the facts of the numerous transactions involved, a delay of nearly five years after the agreement was made before the commencement of the action is *held* not to have constituted laches which would bar the action.

6. The fact that the transfers made by and pursuant to such fraudulent agreement were void did not avoid prior valid mortgages of the same property to the transferees, and, the agreement being set aside, they are restored to their legal rights under such mortgages.

7. The mortgagees in such case having disposed of the mortgaged property pursuant to the void agreement, the plaintiffs are entitled to an accounting from them, to the end that the equity of redemption may be reached and applied to the satisfaction of plaintiffs' judgments.

8. A finding of the trial court to the effect that the mortgagees had managed the property in the ordinary way of business and had made a *bona fide* effort to obtain as much as possible therefor, and that the net proceeds were insufficient to pay their claims, is *held* not conclusive, it appearing that both the debtor and the mortgagees supposed, at the time of the transfers, that the property was worth more than said claims and that a substantial surplus would be left for the debtor, and it further appearing that on the trial the parties agreed that it would be premature to go into a detailed accounting until the right thereto was settled, and that therefore no accounting was in fact had and very little testimony introduced.

9. The action being in equity and defendants, the mortgagees, not being chargeable with actual fraudulent intent, equitable principles must prevail in the accounting. Defendants should have credit for sums necessarily paid to preserve the property and relieve it from liens, as well as expenditures reasonably and necessarily incurred in the diligent management of the business, but should not have credit for any sums paid to the mortgagor out of the proceeds of the business unless he actually earned the same by services rendered for defendants in the proper management of the business.

10. A notice of *lis pendens* is constructive notice only of the proceedings in the action in which it is filed and of the rights of the parties to that action.

11. Actual knowledge that one judgment creditor of an insolvent has brought action to set aside as fraudulent a conveyance by the debtor does not, as matter of law, prevent the person having such knowledge from becoming, as against other creditors of whose claims he has no notice, a purchaser in good faith from the debtor's grantee.

APPEAL from a judgment of the circuit court for Wood county: CHAS. M. WEBB, Circuit Judge. *Reversed as to a part of the defendants; affirmed as to the others.*

This is an action in equity by the plaintiffs, as judgment creditors of one *J. E. Leahy*, to set aside as fraudulent a number of mortgages, deeds, and other transfers of real and personal property made by *Leahy*. The transactions involved were numerous, and the testimony voluminous; but the dispute was principally as to the proper legal inferences to be drawn from the facts, rather than as to the facts themselves. The following facts were substantially undisputed;

This action was commenced September 6, 1895. The plaintiffs are creditors of *J. E. Leahy* in various amounts, aggregating more than $20,000, whose claims accrued in or about the years 1889 and 1890, and whose judgments were entered at various times between December, 1890, and April, 1896. Some of the judgments were not obtained until after the commencement of this action, and the parties were brought into this action on motion before the trial. Executions had been issued and returned unsatisfied upon most of the judgments prior to the commencement of the action.

In 1886, and for some years prior, the defendant *J. E. Leahy* and one M. P. Beebe, as partners, were doing a general lumbering and logging business at Wausau, Wisconsin, owning and operating a sawmill with a capacity of eight or ten million feet per year. The title to the mill was not in the firm, but each partner had title to an undivided half interest therein. In addition to the firm business, *Leahy* also

carried on an individual logging and lumbering business, his logs being manufactured into lumber at the same mill. Henry Corwith, deceased, of Chicago, was a capitalist, of whom both *Leahy* individually and the firm of Leahy & Beebe borrowed large sums of money for business uses in and prior to the years 1885, 1886, 1887, and 1888, giving security therefor by way of mortgages and contracts, assigning logs or lumber as security. One John Ross, of Galena, Illinois, was Corwith's agent, who negotiated these loans, and had some interest in the profits of such loans, and was frequently at Wausau. January 19, 1886, *Leahy* owed Corwith on previous loans $31,215.49, and gave his note therefor. January 21, 1886, *Leahy* made a contract with Corwith, through Ross, to borrow $20,000 additional,— the money to be advanced at intervals during the year,— and gave a mortgage on the undivided half of the mill property therefor; and a written agreement was also made that this mortgage should not be recorded, except in case of default in the payments or the death of either party. Further loans were made by Corwith to *Leahy*, of $10,000 January 8, 1887, and of $10,000 March 22, 1888, both secured by contracts giving logs as security; and for the loan of January 8, 1887, 143 shares of stock of the Wausau Boom Company were assigned to Corwith as collateral security. None of the agreements above referred to were recorded or filed, except the mortgage upon the mill, which was recorded at a later period, as hereinafter stated. On the 15th of September, 1888, Henry Corwith died testate, leaving the defendants *Charles R. Corwith* and *John Corwith* his executors, who duly qualified.

On December 26, 1888, *Leahy* owed *James McCrossen* $15,000 for goods purchased at *McCrossen's* store in Wausau, which amount was afterwards increased. In July and September, 1890, *Leahy* purchased pine timber of *McCrossen* on credit, amounting to $31,500, and *McCrossen* was also liable

as indorser on *Leahy's* notes for $20,500, making *Leahy's* total indebtedness to *McCrossen* in November, 1890, $73,760. November 13, 1890, *McCrossen*, who was then residing and in business in Ashland county, came to Wausau and demanded security of *Leahy* for his indebtedness, and *Leahy* gave him a mortgage on a large amount of lands in Price, Lincoln, and Oneida counties; also a chattel mortgage on his horses, oxen, sleds, and camp outfits in the woods; also a mortgage on lands in Marathon county. These mortgages covered the great bulk of *Leahy's* property outside of the mill, but not quite all of it. *McCrossen* then left Wausau, having recorded his mortgages, and returned to Ashland county.

On November 18, 1890, *Leahy* sent the following letter to *Charles R. Corwith*, at Chicago: "*Charles R. Corwith*, Esq., Chicago, Ill.— Dear Sir: I am not satisfied with the way my affairs are running, and would therefore advise you to send that mortgage against the mill here at once and have it recorded. Don't delay this matter. Send by first mail to register of deeds, Wausau, Wisconsin. Yours truly, *J. E. Leahy*." *Leahy* then owed the Corwith estate about $60,000, for which it had as security the unrecorded mortgage on the mill for $20,000, referred to in the letter, and the various contracts above referred to. *Charles R. Corwith* immediately came to Wausau, placed the real-estate mortgage on record, and saw *Leahy*. He then first learned, as the court finds, of the large indebtedness to *McCrossen*, and also of *McCrossen's* mortgages. He asked for security, and obtained, November 21, 1890, a second mortgage upon the real estate mortgaged to *McCrossen*, and recorded the same. On the following day he purchased of *Leahy* and Leahy & Beebe 250 shares of Wausau Boom Company stock at eighty-eight cents on the dollar, amounting to $11,000, and agreed to apply the same on the indebtedness of *Leahy* and Leahy & Beebe, and returned to Chicago.

Affairs remained in this situation until December 1, 1890, when a meeting was held at Wausau between *Leahy, McCrossen, Charles R. Corwith,* Ross, also Mr. Alexander Stewart and Mr. W. C. Silverthorn, and a conference had as to *Leahy's* affairs. As a result of this meeting an agreement was executed on the following day known as the "Tripartite Agreement." This agreement was signed and acknowledged by *McCrossen, Charles R. Corwith,* and by *J. E. Leahy* and his wife, and, after reciting the indebtedness to *McCrossen* and *Corwith,* and the various securities which had been executed therefor, proceeds as follows:

"And whereas, all the parties to this instrument have agreed, and do hereby agree, that the said property, both real and personal, shall be so managed as to yield the greatest amount available therefrom, by carrying out the plans of operation in the logging and lumbering business already begun for the present season, so as not to sacrifice thereon by disposing of the same immediately or by forced sales; and whereas, said *James McCrossen* has not ready means to carry on such operation: Now, therefore, for a consideration of the mutual promises and understanding herein contained, it is hereby agreed that the said *Charles R. Corwith* shall and have immediate possession of all of the said property, both real and personal, on following terms and conditions, namely: The said *Charles R. Corwith* shall continue on with the operations of logging and lumbering already begun, and shall furnish necessary means and funds necessary therefor; and the said *James McCrossen* shall have the general supervision and control of such operations for the present time until the logs and timber put in and to be put in, in all of the several camps, shall be logged, put in, driven, sawed and manufactured into lumber, and piled. The said *Charles R. Corwith* shall dispose of all of the said property in such a way and upon such terms as will bring the greatest amount for all parties concerned under that contract, in so far as

his judgment shall dictate and improve (*sic*), under the terms, conditions, and the intentions of the parties expressed and set forth in this instrument; and the proceeds thereof shall be applied by the said *Corwith* upon the following named indebtedness and advances, and in order as follows:

"*First.* For the said payment of the five last-named promissory notes mentioned in the list of notes in the indebtedness of said *J. E. Leahy* to said *James McCrossen*, amounting in the aggregate to twenty thousand five hundred dollars, with interest thereon.

"*Second.* The said payment and reimbursement to the said *Charles R. Corwith* for all the funds and moneys to be advanced and paid by him from this time forward in carrying on said logging and lumbering business, as hereinbefore set forth, together with interest thereon at the rate of eight per cent. per annum, and including any and all funds which may be necessary for him to advance to discharge any and all taxes, judgments, and liens upon any or all of the property mentioned in any of the said securities which may be prior thereto, and including any and all taxes which may be necessary to pay hereafter upon any of the said property before the same is disposed of.

"*Third.* Payment of the said indebtedness of the said *Leahy* to the said *McCrossen* as hereinbefore set forth and not already provided for, by the payment of the said five notes, amounting to twenty thousand five hundred dollars ($20,500), and interest, as aforesaid.

"*Fourth.* To the payment of the said indebtedness of the said *J E. Leahy* to said *Charles R. Corwith*, hereinbefore mentioned and set forth.

"*Fifth.* The payment to the said *J. E. Leahy*, or his representative and assigns, of any surplus which may remain after their imbursement and payment hereinbefore provided for.

"And it is further agreed that the said *McCrossen* shall

furnish the said *Corwith* regular reports of the operations,. moneys received and disbursed thereon, and of the conditions of said operations, and the said *McCrossen* shall be allowed and paid a reasonable amount for his services according to the time actually devoted thereto. And it is further understood and agreed that said *McCrossen* and the said *Charles R. Corwith* may each take for themselves such of the said property hereinbefore mentioned and referred to as they may agree upon, to be applied upon their several sums of indebtedness, respectively, at a fair and reasonable valuation and price therefor.

" And in consideration of the premises the said *J. E. Leahy* does hereby grant, sell, transfer, and quitclaim to said *James McCrossen* and *Charles R. Corwith*, and to their, and each of their, heirs, executors, representatives, and assigns, all his (the said *J. E. Leahy's*) right, title, claim, and interest whatsoever in and to all and each and every piece and parcel of the said real estate mentioned in the said several mortgages, securities, and instruments. Likewise the said *J. E. Leahy* hath and doth hereby sell and transfer to the said *James McCrossen* and *Charles R. Corwith* all and each and every piece of personal property mentioned and referred to in the said documents. And, for the purpose of the conveyance of said real-estate property above referred to, *Mary D. Leahy*, wife of said *J. E. Leahy*, joins with her husband in the signing and execution of this instrument, and conveys all her right, title, and interest in said property to the same grantees aforesaid."

This agreement never was recorded. Upon the following day (December 3, 1890) *Leahy* and wife deeded to *Charles R. Corwith* the undivided half of the sawmill for the agreed price of $15,000, which was to be applied on *Leahy's* indebtedness to the Corwith estate. A part of the Beebe interest in the mill had been acquired by the Corwith estate before this time, and immediately *McCrossen* and *Corwith*

took possession of the mortgaged property, and for two years logged the mortgaged lands, driving the same to the mill aforesaid, and manufactured the same into lumber and sold it; *Corwith* advancing the necessary money to carry on the business, and to pay taxes, judgments, and prior liens referred to in the tripartite agreement. *Corwith* received the money for lumber sold in the business, and at the close of the second year's business he first paid the notes of $20,500 on which *McCrossen* was indorser. Then he paid the moneys advanced by himself for expenses of the business and the discharge of taxes, judgments, and prior liens, after which there was left in his hands $2,052.62 in money, together with some of the mortgaged property still remaining unsold, all of which he turned over to *McCrossen*. *McCrossen* applied the $2,052.62 on his indebtedness, sold the remaining property from time to time, and realized therefrom about $6,000, making $8,070.73, which he indorsed on *Leahy's* notes. *McCrossen* also, by agreement with *Leahy*, took back some scattering uncut pine timber which he (*McCrossen*) had sold *Leahy* on credit, and allowed him $8,000 therefor upon his indebtedness. He also foreclosed the mortgage on the Marathon county lands, and realized $1,763.87 on sale thereof, and there remained due him over $35,000 after all said securities had been exhausted.

In February, 1893, the sawmill was sold to the defendant *The Jacob Mortenson Lumber Company*, and *Corwith* received $6,000 on such sale for the undivided one-half thereof deeded to him by *Leahy*, December 3, 1890. The *Mortenson Lumber Company* had no actual notice of any defect in *Corwith's* title, and it went into immediate possession of the mill, and made extensive improvements therein at large expense prior to the commencement of this action.

*Leahy* was unquestionably hopelessly insolvent when the mortgages and conveyances of November and December, 1890, were made. On November 21, 1890, *Leahy* also owned

an undivided one-half of six city lots in Wausau, the other half being owned by the defendant *M. A. Leahy;* and on that day he deeded his interest in the lots to the defendant *Henry G. McCrossen,* and received *McCrossen's* note for $800 in payment therefor, which note was never paid. *Leahy* afterwards transferred the note to his wife, *Mary D. Leahy,* for $800 (which sum, however, was not shown to have been derived from her separate estate); and in March, 1894, *Henry G. McCrossen* deeded the lots to *Mary D. Leahy,* and took back his note. *Mary D. Leahy* afterwards conveyed the lots to various innocent purchasers, and received the proceeds of such conveyances.

The plaintiffs attacked as fraudulent the original mortgage on the mill given by *Leahy* to Corwith in 1886, the deed of the same of December 3, 1890, and the subsequent deed to the *Mortenson Lumber Co.;* also the transfer of the boom stock to *Charles R. Corwith;* also the mortgages, both real and chattel, made by *Leahy* to *McCrossen* and *Corwith* in November, 1890; also the tripartite agreement of December 2, 1890; also the transfer of the city lots to *Henry G. McCrossen* November 21, 1890. The court, however, found that all the transactions attacked were entered into in good faith and were free from fraud, and that the complaint should be dismissed as to all the defendants, except as to the defendant *Mary D. Leahy,* and that as to her the plaintiffs might, if they desired, have a judgment requiring her to account for any part of the proceeds of sales of the city lots which was still in her hands. Judgment was entered in accordance with the findings, and the plaintiffs appeal.

For the appellants there were briefs by *Brown & Pradt, Mylrea & Bird,* and *Thompson, Harshaw & Thompson,* and oral argument by *Neal Brown, C. B. Bird,* and *J. C. Thompson.* As to the effect of withholding a mortgage from record in order to give credit to the mortgagor, they cited *Blennerhassett v. Sherman,* 105 U. S. 100; *Coates v. Gerlach,*

Kickbusch and others vs. Corwith and others.

44 Pa. St. 43; *Hilliard v. Cagle*, 46 Miss. 309; *Hafner v. Irwin*, 1 Ired. Law, 490; *Hildeburn v. Brown*, 17 B. Mon. 779; *Neslin v. Wells*, 104 U. S. 428; *Jewett v. Sundback*, 5 S. Dak. 111; *Liddel v. Allen*, 90 Iowa, 738; *Bunch v. Schaer*, 66 Ark. 98; *Francis v. Lawrence*, 48 N. J. Eq. 508; *Montgomery v. Phillips*, 53 N. J. Eq. 203; *State to use Meyer v. O'Neill*, 151 Mo. 67; *Thompson Nat. Bank v. Corwine*, 89 Fed. Rep. 774; *Steele v. Coon*, 27 Neb. 586; *Fetters v. Duvernois*, 73 Mich. 481; *State S. Bank v. Buck*, 123 Mo. 141; *Central Nat. Bank v. Doran*, 109 Mo. 40; *Adams v. Curtis*, 137 Ind. 175; *Lehman, Durr & Co. v. Van Winkle*, 92 Ala. 443; *Pendleton v. Hughes*, 65 Barb. 136. That the tripartite agreement constituted a voluntary assignment and was void: *Winner v. Hoyt*, 66 Wis. 227; *Collins v. Corwith*, 94 Wis. 514; *Sweet, Dempster & Co. v. Neff*, 102 Wis. 482; *Strong v. Kalk*, 91 Wis. 29; *Maxwell v. Simonton*, 81 Wis. 635; *Fuller & Fuller Co. v. McHenry*, 83 Wis. 573; *Northern Nat. Bank v. Weed*, 86 Wis. 212; *Jameson v. Maxcy*, 91 Wis. 563; *Dahlman v. Greenwood*, 99 Wis. 163.

For the respondents there was a brief by *Ryan, Hurley & Jones*, and oral argument by *M. A. Hurley* and *T. C. Ryan*. As to the right of a creditor to take security from an insolvent debtor, they cited *Menzesheimer v. Kennedy*, 75 Wis. 411; *Cribb v. Hibbard, S., B. & Co.* 77 Wis. 199; *Michelstetter v. Weiner*, 82 Wis. 298; Stats. 1898, secs. 2320, 2323, 2324; *Gillett v. Phelps*, 12 Wis. 392; *Bleiler v. Moore*, 94 Wis. 385; *Hyde v. Chapman*, 33 Wis. 391; *Hoey v. Pierron*, 67 Wis. 262; *Barker v. Lynch*, 75 Wis. 629; *Erdall v. Atwood*, 79 Wis. 7; *Second Nat. Bank v. Merrill*, 81 Wis. 149, 150; *Kaufer v. Walsh*, 88 Wis. 63; *Kapernick v. Louk*, 90 Wis. 234; *Leisen v. Roberts*, 80 Wis. 572; *Darland v. Rosencrans*, 56 Iowa, 122; *Ingram v. Osborn*, 70 Wis. 192; *Greene & B. Co. v. Remington*, 72 Wis. 654; *Mehlhop v. Pettibone*, 54 Wis. 657; *Norwegian P. Co. v. Hanthorn*, 71 Wis. 536; *Mendelson v. Paschen*, 71 Wis. 593; *Carey v.*

Kickbusch and others vs. Corwith and others.

*Dyer,* 97 Wis. 554; *Cunningham v. Eagan,* 102 Wis. 272.
Even when mortgagees have knowledge of a creditor's in-
tent to hinder or delay creditors, that alone does not make
their securities invalid. *Koch v. Peters,* 97 Wis. 492; *Carey
v. Dyer,* 97 Wis. 554; *H. B. Claflin Co. v. Grashorn,* 99 Wis.
356; *Bleiler v. Moore,* 94 Wis. 385.

Winslow, J.   A previous creditors' bill seeking to set
aside as fraudulent the mortgage and subsequent deed of
*Leahy's* half of the sawmill property was before this court
in the case of *Collins v. Corwith,* 94 Wis. 514.   It was there
held, in accordance with the decision of the trial court upon
evidence less full than that now before us, that the mort-
gage was fraudulent as to creditors, because withheld from
record for years pursuant to agreement of the parties, for
the purpose of giving *Leahy* a false financial standing, and
that the deed of December 3, 1890, to *Charles R. Corwith*
was simply one part of an entire transaction which consti-
tuted an assignment for the benefit of creditors and was
void because not executed as required by law; following
the rule laid down in *Winner v. Hoyt,* 63 Wis. 227, and sub-
sequent cases along the same line.

While this former decision is in no sense *res adjudicata*
in the present case, it concerns the same transaction, and is
founded upon much the same evidence, and is entitled to
considerable weight.   Certainly, if a different conclusion is
now to be reached, it should be because a substantially dif-
ferent case is presented by the evidence.   Instead of this,
however, the evidence now before us makes the fraudulent
character of the mortgage in 1886 plainer than before.   The
agreement not to record the mortgage was made in writing.
It was observed for more than four years.   The reason was,
according to *Leahy's* own statement, that if recorded it
would injure his credit in the matter of hiring men and
teams in the woods and at the mill.   The reason given is

an entirely consistent and probable ·one, and in fact about
the only probable reason for such a course.   The testimony
of the various plaintiffs shows that they gave *Leahy* credit.
on the strength of his apparent ownership of the mill, and
that they had no knowledge of the mortgage.   We perceive
no escape from the conclusion that the mortgage was with-
held from record by agreement of the parties for the very
purpose of giving *Leahy* a false financial standing, and to
deceive persons dealing with him, and hence was, under
well-settled principles, fraudulent as to creditors so deceived.
*Blennerhassett v. Sherman*, 105 U. S. 100; *Collins v. Corwith*,
94 Wis. 514; *Evans v. Laughton*, 69 Wis. 138.

This mortgage, then, being void as to the plaintiffs, we
come next to the consideration of the real-estate and chat-
tel mortgages of November 13 and 21, 1890, to *McCrossen*
and *Corwith*, and the transfer of the boom stock of Novem-
ber 22, 1890.   While the consideration for these transfers
was attacked in the plaintiffs' complaint, the evidence
showed beyond dispute that the indebtedness which they
were given to secure was *bona fide*, and the court so found.
The court also found that these mortgages and transfers
were all made in good faith and with no intent to defraud
or delay creditors.   While it may be true that there was
evidence in the case pointing to a different conclusion, still
we are unable to say that the conclusion reached by the
court is against the clear preponderance of the evidence.
The facts that the mortgages were made to secure *bona fide*
debts; that the creditors had 'a right to collect or secure
such debts, even though *Leahy* was insolvent; that they at
once recorded their mortgages,— are all cogent facts in favor
of the conclusion reached by the trial court, and doubtless
had great weight.   For the reasons already stated, we are
compelled to affirm the conclusions of the trial court as to
the validity of the transactions of November 13, 21, and 22,
1890, including the transfer of the boom stock.

But, whatever hope *Leahy* may have had in November of continuing his business and discharging his obligations in the usual way, that hope evidently disappeared when he arranged the meeting of December 1st following. This meeting was attended by *Corwith*, Ross, *McCrossen*, *Leahy*, and two friends of *Leahy*. At this time it was recognized by all that *Leahy's* affairs were in such a desperate situation that he could continue business on his own account no longer; and the question presented was, how could the business be conducted, and *Corwith* and *McCrossen* paid, and have something left for *Leahy*. Large advances of money would be necessary, and it was evident that *Corwith* was the only person who was able to make the advances. The result of this conference was the execution of the tripartite agreement, and the deed of the undivided half of the mill property to *Corwith*. That the execution of the deed last named was part and parcel of the transaction is to us clearly evident from the testimony, although the trial court found that it was an independent transaction. Every indication points to the conclusion that the whole transaction was one,— the situation of the parties, the problem which they were endeavoring to solve, the joining of both interests in the tripartite agreement, the close proximity in point of time, and many other facts too numerous to mention in detail. Again, *Leahy* so testified upon the trial of the *Collins and Corwith Case*, and, although he changed his testimony somewhat upon the present trial, he was obliged to admit substantially in this case that the deeding of the mill was part of the talk; and, while both *Leahy* and *Corwith* now deny that it was agreed that *Leahy* should have the mill back after the *Corwith* debt was paid, they both admit that it was understood that he (*Leahy*) should have the first chance to purchase it, but no price was fixed.

Giving the testimony all reasonable weight so far as it tends to support the conclusion of the trial court on this

point, we still conclude that the overwhelming weight of the direct evidence as well as of the circumstantial evidence shows that the transactions of December 1st, 2d, and 3d were all one. Reaching this conclusion, there can be no doubt of the legal inference which must follow, and that is that the entire transaction constituted a voluntary assignment for the benefit of certain creditors, which is void because not executed as the statute requires. The terms of the tripartite agreement are too plain to admit of reasonable controversy on this point. There was a transfer of some, though not all, of the debtor's property. There were certain trusts named in the transfer. There were trustees. There were creditors besides *Corwith* and *McCrossen* to be paid, namely, the holders of judgments and liens and tax claims. There was provision for the reversion of the surplus to *Leahy*. This combines all the elements of a voluntary assignment. It was not necessary that all of the debtor's property should be conveyed. *Jameson v. Maxcy*, 91 Wis. 563.

But it is said that the transaction was not attacked on this ground in the complaint, but only on the ground of actual fraud, and hence that it cannot be set aside, even if it be in violation of the assignment law, because no such issue has been raised. While the complaint does not charge in so many words that the transaction constituted an unlawful voluntary assignment, it sets forth the tripartite agreement in full, and contains the general allegation that all the said transfers were executed as parts of one transaction, with the intent and purpose of having all the property *held in trust* for the use and benefit of said *Leahy contrary to law;* and we think this allegation amply sufficient to cover the proposition.

The transfers of December 2 and 3, 1890, were therefore constructively fraudulent and void as to creditors, although not tainted with actual fraudulent intent. But it is said that by delaying the commencement of this action for nearly five

years after the transfer, during which time the property has
been sold and disposed of, the plaintiffs have been guilty of
laches which should equitably bar this action.   The argu-
ment would be strong, had the plaintiffs had any knowledge
or means of knowledge of the character of the transaction
of December 2 and 3, 1890.   The tripartite agreement was
never recorded.   The deed of the undivided half of the mill
was recorded, but contained no hint of the real transaction.
It is true that the defendants *McCrossen* and  *Corwith* were
in possession of the real and personal property mortgaged
in November, 1890, but they had recorded mortgages cover-
ing such property, and there was nothing to inform the
plaintiffs that they were in possession in any other capacity
than as mortgagees.   The tripartite agreement did not be-
come known to any of the plaintiffs until it came out in the
course of the testimony of *Mr. Leahy* taken in the case of
*Collins v. Corwith*, some time in the year 1893 or 1894.   At
that time, of course, the *Collins Case*, involving similar issues,
was as yet undecided.   After the discovery was made, rea-
sonable diligence seems to have been used in the commence-
ment of this action.   The number of transactions involved,
the difficulty of obtaining facts in the control of adverse
parties, and the fact that both *Charles R. Corwith* and *John
Corwith* were nonresidents of the state and rarely here, all
tended to embarrass and delay the plaintiffs in commencing
their action; but it was finally commenced in September,
1895, and we cannot say that the delay constituted laches
under the circumstances.

The fact that the transfers attempted to be made by the
tripartite agreement are void does not, however, avoid the
prior valid mortgages.   The fraudulent agreement being set
aside, the grantees are restored to their legal rights under
the mortgages.   Bump, Fraudulent Conveyances (4th ed.),
§ 484.   From these conclusions it necessarily results that
the plaintiffs were entitled to an accounting at the hands

of the mortgagees of the disposition made by them of the mortgaged property, to the end that the equity of redemption therein may be reached and applied to the satisfaction of the plaintiffs' judgments. But it is said that the court has found that this equity was of no value. It is true that there is a finding to the effect that sufficient evidence was introduced to prove the fact that the business was conducted in the ordinary way of business, and that *Corwith* and *Mc-Crossen* made a *bona fide* effort to obtain from the property as much as possible over and above necessary expenses, and that the net proceeds were all applied towards the payment of the indebtedness to *McCrossen*, and it is a fact that such proceeds were insufficient for that purpose; but it further appears that the parties agreed that it would be premature to go into a detailed account of the moneys received or expenses incurred until after the question of the right to an accounting was settled, and that therefore no accounting was in fact had and very little testimony introduced. We cannot regard this summary disposal of the question upon mere general statements as to the manner of conducting the business as in any way conclusive or satisfactory. Such statements are easily made, and very intangible and hard to meet. The evidence showed that both *Leahy* and the mortgagees considered the property of greater value than the amount of the claims for which it was transferred, at the time the transfer was made, and that there would be a substantial residuum for *Leahy*. The plaintiffs are entitled to a full and fair accounting to ascertain what the facts are, and this they have not had.

It may not be wise or practicable to lay down exact rules in advance upon which the accounting is to be conducted, but, the action being in equity and the defendants not being chargeable with actual fraudulent intent, equitable principles must prevail. Generally it may be said that they will be chargeable with the property which they received, and

which has been retained by them without sale, at its reasonable value; and, as to such property as they have sold, they should be charged such sums as in a diligent prosecution of the business they realized, or ought to have realized, therefrom. Their duty certainly was to realize all from the property sold that could be realized by prudent business men in the course of a reasonably diligent management of the business. They will be entitled to credit for the sums necessarily paid to preserve the property and relieve it from liens, as well as the expenditures reasonably and necessarily incurred in the management of the business in the manner above stated. If, as the evidence seems to show, any sums have been paid to *Leahy* from the proceeds, they will not be entitled to credit therefor, unless it appear that *Leahy* actually earned the same by services rendered for the defendants in the proper management of the business. Under these general rules, it is not believed that there can be serious difficulty in the proper statement of the account.

As to the claim that the *Mortenson Lumber Company* purchased the undivided half of the mill with notice of the claims of the plaintiffs, and hence that their conveyance can be set aside in this action, we find no occasion to set aside the conclusions of the trial court in that regard, to the effect that said company purchased in good faith without notice. No claim had been made by any of the plaintiffs against this property at the time of their purchase. It is true that when the company purchased the property the Collins suit was pending, brought to set aside the Corwith mortgage and deed as fraudulent as against creditors, and that a *lis pendens* was then on file, and that their abstracts showed the filing of the *lis pendens*, describing the action as an action to set aside the mortgage. These facts the company's officers knew. The object of the Collins suit was simply to set aside the Corwith mortgage and deed to an extent sufficient to satisfy Collins's judgment against *Leahy*, amounting to

about $1,600. Of course, the *Mortenson Lumber Company* took the risk of any recovery in the Collins action, because they had actual notice of the pendency and purpose of the action, and their conveyance was recorded after the filing of the *lis pendens*. But (as the court found on sufficient evidence) they had no actual notice of any claims by these plaintiffs as to the property; and so the question is, Did the filing of the *lis pendens* in the *Collins Case*, or the actual knowledge of that case possessed by the company, constitute such notice of the possible claims of other possible creditors that they could not acquire a good title as against such creditors? We think this must be answered in the negative. The *lis pendens* itself is constructive notice only of the proceedings in the action in which it is filed, and of the rights of the parties to that action. Stats. 1898, sec. 3187; *Stout v. Philippi M. & M. Co.* 41 W. Va. 339.

Did the actual knowledge which the *Mortenson Company* had that Collins had brought action claiming that the *Corwith* deed was fraudulent as matter of law prevent the company from becoming purchasers in good faith? Certainly the fact was competent proof on the subject, and might, in connection with other facts, constitute notice which should have put the purchaser upon inquiry, but we do not think that it can be held conclusive. The fact that the company immediately spent at least $8,000 in improvements on the mill is a circumstance properly to be considered on the question of good faith, as well as the fact that they were advised by their attorneys who examined the abstract that the title was good. Upon the whole case we are unable to say that the finding of the court upon this question is erroneous. But *Corwith*, having received $6,000 for the undivided half of the mill upon sale thereof to the lumber company, and having no valid lien thereon or title thereto as against these plaintiffs, must be held liable to account for the same in this action, except for such part thereof, if any, as he has paid to discharge the Collins debt.

As to the transfer of the city lots to *Henry McCrossen*, we are unable to say that the conclusions of the trial court were contrary to the evidence. A discussion of the evidence on this point would scarcely be profitable.

*By the Court.*— As to the defendants *Corwith, James Mc-Crossen*, and *J. E. Leahy*, the judgment is reversed, and the action remanded for further proceedings in accordance with this opinion, with disbursements and clerk's fees to be taxed against said respondents, but no attorney's fees. As to the remaining defendants the judgment is affirmed, without costs.

BARDEEN, J., took no part.